UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:12-CV-00197-TBR

JASON L. BANKS                                                                                           Plaintiff

v.

STEVE HILAND, *et al.*                                                        Defendants

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Defendants Eric Hampton, Chanin Hiland, Steve Hiland, Chad Knight, Harlin Martin, John Wood, Diana Yeager, and Randy White's (collectively referred to as "Defendants") Motion for Summary Judgment. (Docket No. 35.) Plaintiff Jason Banks has filed a Motion for Summary Judgment, (Docket No. 44), which the Court will treat as a response to Defendants' Motion for Summary Judgment.[1] Defendants have replied. (Docket No. 44.) This matter is now fully briefed and ripe for adjudication. For the following reasons, the Court will **GRANT in part** and **DENY in part** Defendants' Motion for Summary Judgment. (Docket No. 35.)

Plaintiff Jason Banks has filed a Motion for Entry of Default against Defendants Heather Losser and Gingy Grider. (Docket No. 43.) Defendants have responded. (Docket No. 46.) Defendant Heather Losser has filed a Motion for Leave to File an Answer. (Docket No. 48.) For the following reasons, Plaintiff's Motion for Entry of Default is **DENIED**. (Docket No. 43.)

---

[1] Even if the Court read Plaintiff's Motion for Summary Judgment as a Motion for Summary Judgment, rather than a response to Defendants' Motion for Summary Judgment, the Court would **DENY** that Motion. (Docket No. 44.)

Defendant Heather Losser's Motion for Leave to File an Answer is **GRANTED**. (Docket No. 48.)

BACKGROUND

Factual Background and Allegations

Because the Court previously screened Plaintiff's complaint pursuant to 28 U.S.C. § 1915A and dismissed several claims, (Docket No. 15), the Court provides only the factual background relevant to Plaintiff's remaining claims.[2] The claims that remained after the screening were: excessive force claims against Knight and Martin; denial of medical treatment claims against Dr. Steve Hiland, Chanin Hiland, Wood, Grider, and Losser; a retaliation claim against Hampton; equal protection violation claims against Dr. Hiland and Chanin Hiland; and an interference with mail claim against Yeager. (Docket No. 17.)

I. Excessive Force Allegations

Plaintiff alleges that on June 5, 2012, while in the outside recreation cage, he was told by a correctional officer (CO) to stop talking with another inmate.[3] (Docket No. 14, at 3.) He refused to comply and was then told to back up to the cage to be handcuffed. (*Id*.) Subsequently, other COs arrived, which he contends included Knight and Martin. (*Id*.) Eventually, he backed up to the cage and was placed in handcuffs and leg restraints. (*Id*.) Then,

---

[2] The Court notes that, in addition to the original complaint, (Docket No. 1), Plaintiff filed an amended complaint and a second amended complaint, (Docket Nos. 7, 14). Together, these documents comprise 58 pages. Additionally, Plaintiff's original complaint has 54 exhibits and his second amended complaint has 123 exhibits.
    Putting aside the daunting length of these documents, Plaintiff's allegations often lacked clarity and were inconsistent. As a result, the background section represents the Court's best effort to understand Plaintiff's allegations, while giving proper acknowledgment to his *pro se* status.

[3] Defendants allege that Plaintiff was "half-naked in the recreation area masturbating," verbally abusive to staff, and continually refusing orders. (Docket No. 35, at 2.) Relatedly, Defendants have alleged that Plaintiff has an extensive history of masturbating in public areas and/or at prison employees, including when receiving medical treatment and during recreation. While Plaintiff takes issue with a few alleged incidents of this behavior, he does not appear to deny that he often engages in "exhibitionist" behavior.

Plaintiff alleges, Knight and Martin "roughly grabbed each of [his] arms and literally dragged [him] across the compound to three cell house with his pants down to his knees exposing his privates and pushing up on Plaintiff's right wrist causing it to bend in unnatural positions causing it to pop and break." (*Id.* at 3-4.) He alleges that when he got to the entrance door, his "head and left shoulder were repeatedly rammed into the entrance door, walls, strip cages and concrete floor." (Docket No. 14, at 4.)

II. Denial of Medical Treatment Allegations

Plaintiff states that "[d]ating back to 2007 [he] was being treated for a stomach condition more severe than acid reflex." (Docket No. 1, at 10.) Eventually, he was placed on a stomach acid medicine called Bentyl, but when his prescription expired in January 2012 Chanin Hiland refused to renew it in order to "to give him a trial run off of it." (Docket No. 1, at 10; *see also* Docket No. 1-35.) In response, Plaintiff repeatedly asked to be put back on Bentyl, filed grievances, and wrote letters requesting his Bentyl prescription be renewed. (Docket Nos. 1-36; 1-37; 1-39.) Plaintiff maintains that he was taken off the medication by Steve and Chanin Hiland for "punishment reasons" and "retaliation."[4] (Docket No. 7, at 10-11.)

Plaintiff also alleges that on August 3, 2012, he stopped John Wood because he "was experiencing strong abdominal pains and vomiting and was [was] unable to keep any food down," and nothing was done. (Docket No. 14, at 9.) Finally, as to Grider and Losser, Plaintiff alleges they refused him medications and either outright refused him mental health treatment or their treatment was extremely belated. (Docket No. 7, at 15.)

---

[4] Defendants contend that Plaintiff was taken off this medication because of non-compliance with the prescription instructions and because it was not needed. (*See* Docket Nos. 1-41; 1-43.)

III.  Retaliation Allegations

Plaintiff generally alleges that Hampton subjected him to retaliation as a result of complaints and grievances Plaintiff filed against him.[5]  Specifically, Plaintiff alleges that on September 26, 2012, "Hampton set Plaintiff up with some mattress string and wrote [him] up." (Docket No. 14, at 12.)

IV.  Equal Protection Violation Allegations

Plaintiff alleges that on March 29, 2012, he complained of severe stomach and chest pains, but did not see anyone until he had gone five days without eating because of "racial bias." (*See* Docket No. 15, at 12-13; *see also* Docket No. 1-40.)  He lists three white inmates who were allegedly promptly taken to medical after they complained of symptoms similar to his.  (Docket No. 1-40.)

V.  Interference With Mail Allegations

Plaintiff alleges that he is not receiving incoming mail and that his outgoing mail is not being received because Yeager is "throwing away" his mail.  (Docket No. 14, at 14-15.)

STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[5] Plaintiff states that on July 19, 2012, he wrote letters to James Caraway and Warden Randy White about Hampton's harassment of him and other inmates.  (Docket No. 14, at 10.)  On August 20, 2012, he filed another complaint to White about Hampton's harassment.  (Docket No. 14, at 11.)

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The plaintiff may accomplish this by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lews v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012).

DISCUSSION

Plaintiff's Second Amended Complaint asserts claims against Defendants Eric Hampton, Gingy Grider, Chanin Hiland, Steve Hiland, Chad Knight, Heather Losser, Harlin Martin, John Wood, Diana Yeager, and Randy White. (Docket No. 14.) Previously, the Court screened Plaintiff's complaint pursuant to 28 U.S.C. § 1915A and dismissed several claims. (*See* Docket No. 15.) The Court permitted the following claims "against Defendants in their individual capacities for monetary and injunctive relief and their official capacities for injunctive relief to proceed: excessive-force claims against Defendants Knight and Martin; Eighth Amendment

medical claims regarding denial of medical treatment after August 10, 2011, against Defendants Dr. Hiland and Chanin Hiland concerning [Plaintiff's] stomach complaint, against Defendant Wood for denial of medical treatment on August 3, 2012, and against Defendants Grider and Losser for denial of mental health treatment; against Defendant Hampton for retaliation; against Defendants Dr. Hiland and Chanin Hiland regarding alleged equal protection violation[s]; and against Defendant Yeager regarding interference with Plaintiff's mail." (Docket No. 17.)

Eighth Amendment Excessive Force Claims Against Chad Knight And Harlan Martin

I. Chad Knight

"[W]henever prison officials stand accused of using excessive physical force . . . the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). Defendants contend that Knight did not use excessive force to escort Plaintiff back to his cell. (Docket No. 35, at 4, 13-14.) Knight's affidavit states that the walk back to the cell was "uneventful" and that "the inmate was restrained during the escort and did not make any harmful contact with any institutional door, wall, cage, or floor." (Docket No. 35-1.) It also states he did not intentionally harm Plaintiff. (*Id*.) The "Extraordinary Occurrence Report" (EOR) documenting this incident supports Knight's version of the events.[6] (Docket No. 35-2.) This Report includes statements from Officer Douglas Mumma, Officer Chad Knight, Officer Joshua Raper, Sergeant Jonathan Riley, Officer Barry Myrick, and Officer David Ocampo. (Docket No. 35-2.) All of these statements are consistent with Knight's version of the events.

---

[6] Plaintiff contends that Defendants' accusations in their Motion for Summary Judgment that he was masturbating in the yard preceding the alleged excessive force incident are false. (Docket No. 44, at 5-6.) The Court notes that the EOR does not state that Plaintiff was masturbating. (Docket No. 35-2, at 2.)

However, Plaintiff has a different take the incident. He alleges that Knight and Martin roughly grabbed each of his arms, dragged him across the compound, bent his right wrist in unnatural positions, and rammed him into the entrance door/walls/cage. (Docket No. 44, at 4-5.) He contends that cameras "at the [Three] Cellhouse Entrance" would have captured this incident. (*Id*. at 5.) He states the wall area of the Three Cellhouse Strip Cage was the wall that "he was rammed into repeatedly." (Docket No. 44, at 6.) He also has cited a large number of cases which stand for the proposition that a guard's use of force violates the Eighth Amendment when it is used to "maliciously and sadistically cause harm" and "without any penological justification." (*See* Docket No. 44, at 7-10.) Essentially, if the force is meant to cause harm, rather than to keep order, it violates the Eighth Amendment.

Plaintiff's description of the incident is completely different from Defendants' and alleges a cognizable Eighth Amendment claim. Taking the evidence in the light most favorable to Plaintiff, there appears to be a factual dispute as to what happened.[7] While Defendants may have the weight of the evidence, nevertheless there is as a submissible jury issue. Accordingly, the Court will **DENY** Defendant Knight's Motion for Summary Judgment. If a video of these events exist, as believed by Plaintiff, the Defendants must file same with the Court by September 8, 2014. If no such video exists, the Defendants shall likewise notify the Court.

II. Harlan Martin

As to Martin, Defendants argue that he was "not at all involved in escorting Plaintiff to his cell on June 5, 2012." (Docket No. 35, at 4.) In support, they have produced an affidavit of Martin stating he was not involved in the incident. (Docket No. 35-3.) They have also produced

---

[7] When a court considers a motion for summary judgment, it views the evidence submitted by both sides "in the light most favorable to the party opposing the motion." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 160 (1970); *see also Curry v. Scott*, 249 F.3d 493, 505 (6th Cir. 2001).

an EOR showing Martin was involved in a separate, unrelated incident located elsewhere during the time period of Plaintiff's incident. (Docket No. 35-3.) Notwithstanding this EOR, Plaintiff contends that Martin was present and involved with the incident because the other incident was only "about 20 yards" away. (Docket No. 44, at 3.) Plaintiff's position is that Martin was involved in another incident and then became involved in the incident at issue.

Again we have a swearing contest where the weight of the evidence supports Martin. Nevertheless, there is a submissible jury issue and the Court will **DENY** Defendant Martin's Motion for Summary Judgment.

Eighth Amendment Claims Alleging Denial Of Medical Treatment After August 10, 2011

I. Claims Against Dr. Hiland, Chanin Hiland, and John Wood

Defendants contend that Plaintiff's claim that Dr. Hiland and Chanin Hiland refused to provide Plaintiff medical treatment on August 3, 2012, is unsupported and facially contradicted by Plaintiff's medical records. (Docket No. 35, at 14.) The medical records show that Plaintiff saw a medical professional five times during the period of July 17 to August 2, including on both August 1 and 2. (Docket No. 35-8, at 32-36.) Plaintiff complained of five different injuries and symptoms during these visits. The records also demonstrate that Plaintiff routinely sought and received medical care.

Although Plaintiff alleges Dr. Hiland and Chanin Hiland refused to provide him medical care on August 3, the Court notes there is no indication beyond Plaintiff's unsupported allegations that he saw Dr. Hiland on August 3 or even requested to see Dr. Hiland. Moreover, even viewing the evidence in the light most favorable to the Plaintiff, it is clear that Dr. Hiland and Chanin Hiland were not "deliberately indifferent" to Plaintiff's medical needs. *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995). In this case, unlike in *Hill v. Marshall*, 962 F.2d 1209

(6th Cir. 1991), there is not "strong proof of a pervasive pattern of indifference to the inmates' medical needs generally." *Sanderfer*, 62 F.3d at 154. In fact, the opposite is true. There is significant evidence of a pattern of constant attention to Plaintiff's medical needs. Although Plaintiff may not have always received the medication he requested, there was not a "deliberate indifference" to his medical needs. *See id.* ("Therefore, strong proof of a pervasive pattern of indifference simply was not present.").

Notably, negligent administration of medical care is not unconstitutional, and an inmate has no right to have the treatment he or she prefers. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *see also Tillery v. Owens*, 719 F, Supp. 1256, 1305 (W.D. Pa. 1989) ("The Constitution does not guarantee a prisoner the treatment of his choice."). While Plaintiff disagrees with the decision to not give him a certain stomach medication, Bentryl, that decision cannot under any interpretation of the facts rise to the level of "deliberate indifference." Accordingly, the Court will **GRANT** Defendants Dr. Hiland and Chanin Hiland summary judgment on Plaintiff's Eighth Amendment cruel and unusual punishment claim premised on a denial of medical treatment. As to Defendant John Wood, for the same reasons discussed above, the Court will **GRANT** him summary judgment on this claim.[8]

Regarding Plaintiff's general allegation that the Defendants failed to provide adequate medical care, the Court notes that Plaintiff's medical records, (Docket No. 35-8, 9, 10), show he frequently received medical care. Therefore, for the same reasons discussed above, the Court will **GRANT** Defendants summary judgment on this general allegation.

---

[8] The Court notes Wood is a Nursing Service Administrator who provides organizational support and administrative services at KSP. Thus, he is not able to diagnose or treat illness. Additionally, stopping medical providers at some unidentified place is not how inmates receive medical care while incarcerated at DOC facilities. (Docket No. 35, at 5.) Moreover, Wood has no memory of this event and Plaintiff has not produced any documents to support his claim against Wood. (*See* Docket No. 35-4.) In any event, an isolated incident of this nature does not rise to the level of "deliberate indifference."

II. Claims Against Grider And Losser and Plaintiff's Motion for Default Judgment

Plaintiff previously made a Motion for Default Judgment against Defendants Heather Losser and Gingy Grider, (Docket No. 43), because, at the time, they had not filed an answer or taken other action. Subsequent to that Motion, Losser filed a response to the Motion for Default Judgment and a requested an extension of time to file an answer. (Docket No. 46.) Losser also filed a Motion for Leave to File an Answer. (Docket No. 48.)

In Losser's response, she states that it was previously inaccurately determined that she and Grider were not employees of the Department of Corrections. (Docket No. 46, at 1.) This was as a result of Losser being officially known as "Heather Mira" and "Heather Ross," and Grider having been employed by a third-party contractor. (Docket No. 46, at 1-2.) Subsequently, the Justice and Public Safety Cabinet has stated it will not be representing Grider given her employment by a third-party contractor and will not be representing Losser because of potentially actionable conflict of interests.[9] (*Id*. at 2.)

Although Grider and Losser are not represented by the Defendants' counsel, Defendants note that a cursory review of the medical records "provide dispositive proof that Plaintiff received ample mental health treatment."[10] (Docket No. 35, at 17.) After an extensive review of these medical records, (Docket No. 35-8, 9, 10), the Court agrees. Accordingly, for the same reasons discussed above, the Court finds that there was no "deliberate indifference" to Plaintiff's

---

[9] Losser recently separated from state service and is challenging that separation before the Kentucky Personnel Board. Therefore, to avoid potentially actionable conflict of interests and to meet their obligations to Losser, the Department of Corrections has retained the Attorney General's office to provide representation to Losser. (*See* Docket No. 46.)
   Grider is employed through CorrectCare Integrated Health, Inc. and may be served at the Kentucky State Penitentiary, 266 Water Street, Eddyville, KY 42038, or at the CorrectCare offices at 366 S. Broadway Lexington, KY 40508. (*Id.*)

[10] Defendants note that Grider and Losser continued providing mental health care to Plaintiff even though he "consistently began immediately masturbating almost every time Plaintiff saw a female staff member." (Docket No. 35, at 17.)

mental health care needs and, therefore, will **GRANT** Defendant Losser summary judgment on this claim. Defendant Heather Losser's Motion for Leave to File an Answer, (Docket No. 48), is also **GRANTED**.

As to Grider, it appears she has not been properly served. Plaintiff attempted to serve Grider through the Justice and Public Safety Cabinet. (*See* Docket No. 18.) Defendants' counsel, Stafford Easterling of the Justice and Public Safety Cabinet, waived service on behalf of Grider, (Docket No. 19), however, subsequently the Justice and Public Safety Cabinet has stated it will not be representing Grider because she is employed by a third-party contractor. Accordingly, it appears Grider was not properly served and has no knowledge of this action. Therefore, the Court will **DENY** Plaintiff's Motion for Default Judgment against Grider. Additionally, the Court notes that, like Losser, there is nothing in the record that indicates Grider was "deliberately indifferent" to Plaintiff's mental health care needs.

Retaliation Claim Against Eric Hampton

Defendants have produced an affidavit of Eric Hampton regarding the alleged incident of retaliation:

> On September 26, 2012, at approximately 9:10 a.m., I assisted in moving inmate Jason Banks from cell 7-D-7 to another cell on another walk. Before moving inmate Banks I had to complete an Entry/Exit form. When I flipped his mattress over to inspect it to make sure nothing was left in his cell, I found two envelopes attached to strings that had been pulled from his mattress cover and were attached to two tubes used as weights. There was a hole in the mattress where the strings appeared removed. Due to my institutional training and experience, I am aware that inmates frequently make these type tools to transport contraband to each other . . . Before moving any inmate in or out of a cell, an Entry/Exit Form is completed. After I submitted this form, I completed a disciplinary report form on inmate Banks concerning my findings. Investigating Sergeant Derek M. Roberts reviewed the entry/exit form and it showed that the mattress was okay upon inmate Banks' entry of cell 7D7. Sergeant Roberts reviewed the evidence and found a hole towards the head of the mattress. He reviewed

> the string tied to a tube and it appeared to be the same material from inmate
> Banks' mattress. Officer Robert Clifford was assisting in the cell move and
> was witness to this event.

(Docket No. 35-6.) Although Plaintiff claims Hampton set him up by planting the mattress string and then writing him up for the string, he fails to explain how the mattress was destroyed when Hampton was never in Plaintiff's cell alone. (*See* Docket No. 14-44.) He also fails to explain why the Entry/Exit form showed the cell was completely empty before he arrived if, as he alleges, the two contraband conveyance tools would have been "present at his arrival." Furthermore, Plaintiff's accusations have been inconsistent, as he now claims Hampton "set him up," but previously at a disciplinary hearing claimed that the nylon strings came from the cell he moved into, cell B4. (*See* Docket No. 14-45.) Moreover, even assuming the incident took place as Plaintiff has alleged, Plaintiff has not produced any evidence showing that Hampton's alleged adverse actions were motivated, at least in part, by protected conduct.

In summary, Plaintiff's unsupported, conclusory, and inconsistent allegations, do not support his claim of retaliation against Hampton. The evidence presented by Defendants demonstrates there is no genuine dispute of material fact on this claim. Therefore, the Court will **GRANT** Defendant Hampton summary judgment on this claim.

Equal Protection Claims Against Dr. Hiland And Chanin Hiland

With respect to this claim, Plaintiff alleges that on March 29, 2012, he had severe stomach and chest pains, yet he did not receive medical treatment until he had gone five days without eating. He states that three white inmates with similar symptoms received prompt medical treatment and, therefore, an equal protection violation has occurred. (Docket No. 1-40.)

On approximately March 29, 2012, Plaintiff began a hunger strike because Dr. Hiland and Chanin Hiland would not give him a prescription to Bentyl. (Docket No. 35, at 24.) This

hunger strike continued until April 2, 2012, "when Plaintiff turned to other avenues to attempt to obtain Bentyl."[11] (Docket No. 35, at 24.)

Medical records and affidavits by Dr. Hiland and Chanin Hiland show that Plaintiff's prescription to Bentyl was not renewed because he had no medical need for it because he was no longer on any psychotropic medications.[12] (*See* Docket No. 35, at 21-22.) These records also show that during the period he was off this medication he had not complained of stomach pain and examinations indicated no signs of distress. (*Id.*) Plaintiff was offered the "less powerful but still effective Tagamet" several times, but he refused to take it. (Docket No. 35, at 22.) On March 28, 2012, Plaintiff was seen by the medical department. After a thorough medical examination it was determined that "nothing seemed wrong" and he was "returned to his cell and medical continued to monitor the Plaintiff." (Docket No. 35, at 23.)

Given Plaintiff's frequent visits to medical and the previous decision to not renew the prescription for Bentyl, it is not surprising that Plaintiff was not promptly "seen" or given priority—particularly given that any symptoms he was experiencing were a direct result of his hunger strike. Moreover, medical records show that Plaintiff's status was monitored and documented several times each day during his hunger strike. (*See* Docket No. 35-8, 9, 10.) There is no indication that race played a factor in his medical treatment decisions. Furthermore, while Plaintiff initially listed three white prisoners which he alleges were treated better than him, he has not provided any further details (1) indicating their situations were similar to his, (2) regarding their actual treatment, or (3) that would indicate race played a factor in their alleged

---

[11] Defendants note that Bentyl can give an offender a "high" if sniffed instead of swallowed and allege Plaintiff is engaged in drug seeking behavior in pursuit of a Bentyl high. (Docket No. 35, at 24.)

[12] Apparently, psychotropic medications have a not uncommon side effect of an upset stomach. (*See* Docket No. 35, at 21.)

"preferential" treatment. In summary, Plaintiff's allegations of equal protection violations are unsupported and conclusory. In fact, based on the medical records and affidavits, there is significant evidence that Plaintiff received satisfactory, prompt medical care, even in instances where he likely did not need it. Accordingly, the Court will **GRANT** Defendants summary judgment on this claim.

Interference With Mail Claim Against Defendant Yeager

As to Defendant Postal Technician Diana Yeager's alleged interference with Plaintiff's mail, Plaintiff is apparently making a claim that Yeager "throw[s] away Plaintiff's mail . . . for utilizing the prison's grievance system." (Docket No. 44, at 12.) Yeager's affidavit states that she "never altered, destroyed, or in any way tampered with an inmate's incoming or outgoing mail," including Plaintiff's.[13] (Docket No. 35-5.) Plaintiff has never explained how he is allegedly aware that Yeager is throwing away his mail. To be frank, the Court does not see how he would have personal knowledge of such action, unless Yeager performed the action in his presence, which he has never claimed. Therefore, Plaintiff presents only speculation and conclusory allegations on this claim. Moreover, Plaintiff has also not alleged an unconstitutional policy that is causing this mail to be thrown away. Therefore, there is no genuine dispute of material fact and the Court will **GRANT** Defendant Yeager summary judgment on this claim.

Defendants' Motion for Sanctions

Defendants have moved for sanctions against Plaintiff, alleging he brought completely fabricated and frivolous allegations. (Docket No. 35, at 24-28.) The Court declines to sanction

---

[13] The Court previously dismissed Plaintiff's claims premised on the policy of the mailroom to remove any stamps or return address labels from non-legal inmate mail due to an increase in the use of mail to facilitate illegal activity. (Docket No. 15, at 15-16.) Forbidding removable stamps and return address labels alone does not violate the First Amendment.

Plaintiff, but reminds Plaintiff that if a court determines an action he files is factually frivolous or legally without merit, sanctions could potentially be levied against him.

CONCLUSION

For these reasons, and consistent with the Court's conclusions above,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment, (Docket No. 35), is **GRANTED in part** and **DENIED in part**. Plaintiff's Motion for Entry of Default against Defendants Heather Losser and Gingy Grider is **DENIED**. (Docket No. 43.) Defendant Heather Losser's Motion for Leave to File an Answer is **GRANTED**. (Docket No. 48.)

IT IS SO ORDERED.

Date:

cc: Counsel

Plaintiff Jason L. Banks, *pro se* (#188003)
Kentucky State Penitentiary
266 Water Street
Eddyville, KY 42038